May it please the Court, Craig Goldblatt for the appellants. With the Court's permission, I'd like to reserve five minutes for rebuttal. This appeal presents two principal issues. First, whether Section 1123 A5 of the would otherwise govern a transaction proposed under a plan of reorganization. Second, whether the Bankruptcy Court properly construed Section 105 of the Bankruptcy Code in granting an injunction against future arising silica claims. I'd like to first briefly address the Section 105 issue. The debtors in these cases filed for bankruptcy because they had substantial asbestos liabilities. Before the bankruptcy, they had never paid a penny on account of silica claims. They had one pending lawsuit involving 169 claims. But to obtain the support of the plaintiffs bar, they proposed to create a trust funded exclusively by insurance that would also pay silica claimants. After the debtors solicited votes on that plan, they received 5,000 votes from new silica claimants. The overwhelming majority of those claims were of dubious basis for entering a channeling injunction. That misapprehends the standard that this Court set out in Continental Airlines, which addresses the exceptional circumstances in which a bankruptcy court may enjoin a claim that is not otherwise discharged in bankruptcy. Such an injunction is appropriate only where the debtor meets its high burden of demonstrating that without the injunction, it would be required to liquidate. Here, the without an injunction, the debtor faced the possibility of a runaway jury verdict. Second, the court said it would be better for the debtor to have the certainty associated with an injunction than it would be to manage the liability out in the tort system. But those statements are true of any debtor with an operating business. The determination that this debtor could not reorganize without the injunction was the same type of unsupported conclusion that this court rejected in Continental and fails for that reason. Turning to the question of preemption, the Bankruptcy Code does not preempt provisions in the debtor's insurance policies that require the insurer's consent to the assignment of policies to third parties. Section 1123A of the Bankruptcy Code, which appears in full on page 1A of the statutory addendum to our opening brief, sets out the required contents of a plan. It provides that notwithstanding any otherwise applicable non-bankruptcy law, a plan shall contain eight required elements, including that it must provide adequate means for the plan's implementation. The debtors urge on this court a surpassingly broad reading of this language, under which section 1123A preempts all non-bankruptcy law governing any transaction through which a plan is implemented. Thus, for example, a merger effectuated under a plan of reorganization would be immunized from state or federal antitrust law. That cannot be correct. As a textual matter, the notwithstanding phrase modifies the command that a plan shall contain the eight required elements. Non-bankruptcy law conflicting with those rules regarding what a plan must contain is preempted, but the preemptive scope of section 1123 is no broader than that. Congress certainly could have passed a statute providing that notwithstanding any otherwise applicable non-bankruptcy law, a debtor may engage in any transaction that is a means for implementing a plan, but that is not what section 1123A says. And when Congress did specifically address the application of non-bankruptcy law to transactions included in a plan in section 1142, it preempted non-bankruptcy law only in a much more limited and specific manner, only those laws that relate to the financial condition of the debtor. The Appelese reading of section More broadly, their reading would turn much of the bankruptcy code on its head. It would transform section 1123A, which addresses what a plan must contain, into a sweeping source of affirmative power to override non-bankruptcy law. That reading simply makes no sense. Much of the rest of the bankruptcy code is composed of careful provisions setting out the precise circumstances under which a debtor may escape its state law obligations. Appelese offer no plausible way to with the rest of the code. Moreover, as 18 state amici have come into this court to emphasize, Appelese reading of section 1123A is an extremely dangerous one. It would permit a debtor to abandon contaminated property in violation of environmental law or to transfer a nuclear power plant in contravention of applicable utilities regulations. Congress could not possibly have intended section 1123A to so radically rewrite such large swaths of non-bankruptcy law. I mean, if you could address some of the standing is subsumed in your argument, particularly some preemption, but if you could address the standing issue for Hartford and Continental and also what you were just getting into, perhaps you can help me understand why that argument is not shot down entirely by the argument by the analysis of the Bankruptcy Court in Federal Mogul. Let me let me take this one step at a time. With respect to standing, Your Honor, I think it's important to distinguish standing with respect to the preemption issue as opposed to standing with respect to the 105 issue. With respect to the preemption issue, the plan by its terms overrides our bargain for contractual rights. Help me with that, because based upon the face of the contract, you're obligated to pay certain kinds of claim. Do you insure it against the risk? That risk has now been transferred to a trust, and the risk that was transferred, I understand your argument that the risk that was transferred is not the risk that purportedly initiated the bankruptcy, but it's still an insured against risk. Yes, Chief Judge McKee, if I may explain. With respect to the issue of preemption, the contract that's at issue here has a provision. It says the insured may not assign the policy to a third party without the insurer's consent. All we're asking for is if and when they come asking us for coverage, we can assert that defense in a state court. Combustion engineering, though, basically says unless you're asking us to overturn combustion engineering, and it looks like the causes in this plan were drafted with combustion engineering in mind. With respect, Your Honor, we don't think that that decision in combustion engineering intended to address this question. What the language of the footnote in focused on was the transfer of the policies from the pre-petition debtor to the debtor in possession, and not the subsequent. One sentence followed by a footnote, but the language there is pretty clear. It wasn't the bulk of the analysis, but it did specifically get into the fact that the intent of the bankruptcy code seemed to be to allow these kinds of transfers to occur, and absent these kinds of transfers, could you really have any realistic rejuvenation of a company under Title 11? You have to get the money into the fund. You certainly can, Your Honor. But first, if I may, the dicta in the footnote in combustion engineering, which wasn't focused on this question, we think it would be surpassingly surprising if this court would split, expressly split, with the Ninth Circuit decision in PG&E in dicta in a footnote that never mentioned the PG&E opinion. Right, but why wouldn't it just be PG&E was a year before combustion engineering? Maybe we just didn't think PG&E was very persuasive. Fair enough. In any event, it seems appropriate to us, now that this court is sitting on bonk, to the extent there is ambiguous language that's dicta in a footnote for the court to consider in the first instance whether that's right. Turning, if I may, to your other question, which is would this interfere with the debtor's ability to reorganize? The answer to that is fundamentally no. A debtor that reorganizes in bankruptcy and transfers its policies to a trust without the insurer's consent can sue the insurer later for coverage. When they sue the insurer later for coverage, the insurer can assert defenses. One defense they can assert is that the insurer didn't provide timely notice. Another defense they can assert is that the insurer didn't cooperate with respect to the defense of claims. There's an additional defense, which is... One of the things is that, at confirmation, can you deem yourself to be a party in interest in order to object to this plan? And the argument against that is that there is these are, they have neutrality principles in the, with respect to how the insurance policies are treated. How would you suggest that, in fact, the not neutral? Well, Your Honor, this case is actually a pretty stark example. Well, first of all, of course, to the extent it's expressly overriding our anti-assignment rights, the rights under the consent to assignment provisions, it's not neutral. There's a bargain for contractual provision. The order confirming the plan by its terms takes away that contractual right. But there you do run into a combustion engineering issue. Well, there's the question of the meaning of that reading. To the extent combustion, the footnote in combustion engineering so provides, we think it's incorrect. We don't think that's the only way to read that footnote. We certainly don't think it's the right way to read the statute. It clearly says that the policies are property of the estate and can be transferred under Section 1123? To be sure, the policies... Sort of your characterization that it's dicta as opposed to a... Well, the policies are property of the debtor beforehand. They become property of the estate in bankruptcy. The question is whether otherwise applicable non-bankruptcy law that governs their transfer to a trust is preempted. And the reading of Section 1123A that would so provide is a reading that really makes no sense at all. Another provision of Section 1123A... Didn't we say that notwithstanding any state law to the property of the estate, that's what Section 541 does. But in terms of transfer to a subsequent trust post-bankruptcy, we don't think 1123 does that. If 1123A means that, it means a host of other things that can't possibly be right. Section 1123A5A says that notwithstanding non-bankruptcy law, a plan may provide for the retention by the debtor of any property of the was unlawful under state or federal law, the debtor's reading of Section 1123A5A would mean that the bankruptcy code trumps non-bankruptcy law that would otherwise govern the possession of that property. Mr. Goldblatt, you went back to 1123, but I think Judge Amber was asking, and I'd like to hear, is instead of running smack into Combustion Engineering Note 27 repeatedly, go to the other prong here and answer, if you would, assuming that we felt bound by footnote 27, assume that and wait for a second. Are there other things in the case that you assert run afoul of the bankruptcy neutrality that the debtors claim this has? Okay, holding the 1123A issue aside, with respect, on the 105 issue, the creation of the Silica Trust, if I may, I think the question that Judge Amber was asking had to do with standing. And in that regard, AIG, which has joined in all of our briefs and is an appellant in this case, holds a claim that would run against the Silica Trust. They object to the treatment of that claim by the trust because they can... AIG is different. AIG has a settlement by which it's considered to be a predator, but what about Hartford and the... Okay, well our first submission is under the Supreme Court's decision in FEC versus McConnell, where one party has unquestioned standing. There isn't a need for the court to inquire further into the standing of other parties advancing the same arguments. If the court were nevertheless to address the question of Hartford's independent standing, the answer is that it does have standing, and this case is a pretty stark example of the reasons why... What would be your test for standing for what is a party in interest under 1109, since it's not defined in the code? I think that the test for whether a party is whether a party has standing ought to be whether their rights are affected, or whether as a practical matter they have a stake in the resolution of the case. Here, before the bankruptcy, this company had... was a defendant in one case in which there were a hundred and some claims and had paid a few hundred thousand dollars out of insurance, and on the findings of fact made by the bankruptcy court here, the company will have a hundred and forty-one million... years that they'll seek from us. That could have happened, though, even absent the creation of the trust. That's not likely, but it's possible. It's not... Exactly. It's not likely, but it's possible. But here's the point. As a practical matter, are we worse off because of what happened in the bankruptcy case? The answer is unquestionably yes. We have this whole body of claims that we now have to deal with. Now, we have defenses to those claims. It may not... it's not the case that confirmation of the plan is a trigger that says you have to pay. There are defenses, but it's commonly the case... defenses. Do you have the same defenses in the other procedure? Do you have the same defenses in a tort action as you would have in the procedure? Well, two answers, if I may. First, with respect to the 1123A consent to assignment provision, if the plan is confirmed with that provision, then the answer would be no. With respect to the other defenses, we would have the ability to assert those contingencies. It's a basis on which, when they come to us and say, pay 128 million dollars, we might win. We might win, we might lose. That's uncertain. The standard for standing is, are your rights affected? And here, there's a very plausible story as to why, as a practical matter, we're now worse off than we would have been before. What is the test for that? The test has been... Can I propose a test, possibly, and see if you want to respond? Of course. Judge Gersoner, back in 1992, in a case called, in Ray James Wilson Associates, proposed the following. We think that, this is 1109, we think that all that the section means is that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains. Now, what is your legally protected interest that could be affected by the bankruptcy? Interest or interests? It's the practical economic interest with respect to their coming to us and saying, our legal interest in this regard is the liability of our insured. In a liability context, the subject of liability insurance is the insured's liability. Here, the insured's liability is being fundamentally redefined, and as a result, we have a... How do you say it's fundamentally redesigned? I mean, you can lose your defenses before the trust, under the trust provisions. It is true, but that is exactly why our liability is contingent. Surely, if one were to stipulate, right, that we were going to lose on those coverage defenses, there'd be no question that we have standing in bankruptcy. So, the question is whether the fact that it is contingent, whether there are some circumstances in which we might win, is a basis to deprive us of standing, and in that regard... But does the fact that there are some circumstances where you might lose, therefore, give you standing? We believe the answer to that is yes. We think that's the reasoning of the Supreme Court in the line-item veto case, in which the court explains that the fact that an injury is contingent, if you are, as a practical matter, worse off. The Seventh Circuit's decision in Le Femme Bleue has a similar reasoning. The fact that you're being put with a liability, and you have arguments as to why that liability, you may not have to pay, those issues won't be resolved until later. Are you really worse off, though? I mean, what happens if you go back into, if you had standing, you went back into bankruptcy, and you were to prevail in objecting to the plan? What happens to the 5,000 claims, or what might mushroom into 25,000 claims? Wouldn't you be worse off? We don't believe so, Your Honor. Our position on the facts of this case is that if this Court were to reverse the decision below and say there is no basis for a Section 105 injunction here, that the Court misapplied the standard of the Continental. You still have those same claims. They're not necessarily going to go away. And if those claims are subject to the rigors of the tort system, we don't think that they'll show up at all. In this very case, of those 5,000 claims, we served a subpoena on the plaintiff's lawyer who filed 500 of them. And as soon as we served the subpoena, the plaintiff's lawyer said, oh gee, actually these claims have been dismissed in the state court system, never mind. The purpose of your objecting, or getting standing in bankruptcy, so that you can object this, so that the claims would go away by their own. We think that with respect to many of the claims that are simply created because of the lax standards, they would go away by their own. Some, in fact, went away. And that is indeed correct. By lax standards in the plan, in the way that the procedure that's being adopted to evaluate these in the first instance? I'm not sure what you meant by standards. The presumption? Is that what you're referring to? What I'm referring to is that unlike in the tort system, where there is more rigor with respect to the treatment of silica claims, these claims are being decided, resolved by a trust that is applying, we contend, less rigorous standards than it would otherwise apply. I understand, I understand that's your position. How does this set of circumstances differ from what has been going on in the asbestos area for several years, and where settlement trusts have been formed, and where they have been making these determinations? And I guess my question is, does your interpretation call into question the way the asbestos trusts have been handled, and if it is adopted, doesn't that affect how asbestos trusts will be handled in the future? It does not, Judge Sarekha. The treatment of asbestos in bankruptcy is addressed expressly by Section 534J. But you've got the same, under 105, you've got the same procedure. Same transfers involved? Same transfers, same principles. Oh, that's certainly true, but there are commonly cases in which insurance policies, if you're referring to the Section 1123A issue again, in which insurance policies are transferred to a trust, the insurer hasn't consented to that assignment, and there's subsequent coverage litigation, and the insurer argues the various defenses, including the consent to assignment defense, and those get resolved, however they get resolved, under applicable state law. The standards for the consent to assignment defense, this is a question of state law. So it's the coverage part that you object to? I'm sorry, Your Honor? You're saying you cannot contest the coverage issue? That's correct. Our objection is that we have a defense that is a bargain for defense under the policies, that under Section 1123, their reading of 1123A5, they deprive us of, and what we ask for is the right to go into state court and argue under state law that we're entitled to prevail. Now, that argument may win and it may lose. I thought you were also arguing that, and in fact I thought I heard it just a few minutes ago here today, that irrespective of that anti-assignment provision, your rights were substantively different because, as you just put it, there's a laxer standard, there's a different standard, there's a change in your posture. Is that not your argument? That is, to be clear if I may, that is our position. We don't believe this court needs to reach any of those questions because the standing with respect to Section 1123A is not contested here, and the standing with respect to the 105 injunction, we have a party in the case that holds a claim that is being channeled to the trust. So the broader questions of insurer standing, I'm obviously happy to address whatever questions the court may have, but I don't believe this case brings an occasion in which it would be either necessary or appropriate for the court to address those questions. But you did say that you were worse off in bankruptcy. Yes, and this case is a quite clear example. Well, but the bankruptcy judge made very, very detailed findings and concluded that every defense that you can assert in a tort action, you can assert in bankruptcy, including the assertions of fraud, which I think is one of your primary challenges. Well, isn't that a much more efficient way of doing things than outside of bankruptcy? Well, certainly it reinforces the reason why under Section 1123A, it shouldn't be read to preempt our ability to assert our consent to assignment defense. With respect to whether if that determination is reversed and we are permitted to assert that defense, there is standing here. The first answer in this case is that because AIG holds a claim that's channeled to a trust, the issue needn't be reached. If the court were nevertheless to reach it, we do believe, for the reasons that we set forth, there is a companion case to this, the Narco case, and we addressed the issues of standing at some length in the briefing there. I believe they've been submitted to the court. But under those principles, it's quite clear that standing applies here too. If I may just for a moment reinforce, with respect to the Section 1123 issue, the importance of construing Section 1123A to be limited to what Congress intended to do there, which is set forth the types of provisions that need to be in a plan and not grant sweeping power. Is your best argument on that, that combustion engineering is just wrong? You call it footnote 27 dicta, but go to the merits of it. Is footnote 27 just wrong? To the extent it's inconsistent with our argument, yes. We don't think it has to be read that way. To the extent it supports you, it's absolutely brilliant. That's right. We don't think it has to be read that way. But to the extent it were to be read to conflict with the Ninth Circuit and PG&E, and to put in Section 1123A this sweeping power, this anomalous sweeping power, to that extent, if that's what that footnote says, then it's wrong. There's nowhere else. If you're correct in that decision being wrong, then going back to Judge Sirica's question, doesn't that then undermine the settlement procedure used in the asbestos cases? It seemed to turn on the ability to effectuate that kind of a transfer. No, Chief Judge McKee, because all it does is it puts the anti-assignment, the consent to assignment defense on the same footing as the other defenses, all of which are available to insurers after the fact. So it doesn't undermine reorganization any more so than the fact that the trust needs to provide timely notice or the trust needs to cooperate. Let me ask this. You may not have time for this. Maybe we can discuss some more in your five minutes rebuttal. But it seems to me, given the nature of what's going on here, the nature of what you're alleging in the problems, the public interest focus and everything else that may arise from the creation of a Silica trust when the Silica liability and Silica risk was not even part of the initial reason for filing for Chapter 11, why doesn't an in-ray congoleum give you all that you really need? And that's from a much broader perspective, public interest perspective, than the 1123A5 or the 105. Well, the reasoning of congoleum, certainly with respect to standing, is correct, but doesn't address the question of the consent to assignment. No, it's just the district on standing. In that regard, we think that that decision is correct. In this case, it's far more like that than it is like combustion engineering, where there was a finding that the claims would be handled the same way after bankruptcy as before. But most fundamentally, there is nowhere else in the United States code to our knowledge in which the statute says in one place that all state law is preempted, and then a few sections away have specific detailed provisions addressing the narrow circumstance in which there is preemption. And because of the – Mr. Kublai, your light is on. You did save some time, so we'll hear from you again. Okay. Thank you very much. Thank you. May it please the Court, I am Jim Restivo Reed Smith. I represent the debtors. I wish to highlight that in the 21st century, silica is the second most common substance in the world, and Occupational Lung Disease, silicosis is the largest occupational lung disease in the world. Silica is ubiquitous in all refractory products. The record below establishes that 250,000 American workers are exposed to silica. Between 3,600 and 7,300 new silicosis cases are diagnosed each year. In the period 2002 to 2006, while AP Green was protected from silica suits by the automatic stay, its sister refractory company, Harbison, received and settled 18,000 cases for $110 million. General Refractories was sued 12,000 times. U.S. Silica was sued 30,000 times. And in the Swan Industries case, they estimated 1,000 silica claims coming from a single Tyler Pipe factory. Here, under penalty of perjury, 4,600 current silica claims have been asserted against the debtor, 350 of which come from the Tyler Pipe factory. Second point, not only are silica claims not an urban myth, as suggested by the insurers, they were not created by the debtor. To secure votes for our Asbestos Trust, 106 law firms cast 249,000 votes for the Asbestos Trust. Of that, only 21,000 of the ballots came from the 15 law firms who also had silica claimants. That's about 8%. We absolutely did not need the votes of those 15 silica law firms and there was no conspiracy to create silica claims. Third, Mr. Lockwood will address preemption. I want to say that there is no preemption. In Ray Roach, you say preemption occurs when there is an unavoidable conflict between state and federal law. No conflict exists here, as found by the Bankruptcy Court state law holds that once an event occurs, a policyholder may assign policy rights. Lastly, it is undisputed that the parent company's annual free cash flow is approximately $5.9 million. The findings of fact below were correct. AP Green simply does not have the financial wherewithal to defend and resolve 4,600 present claims, let alone a minimum of 10,000 future claims. At what point did the silica claims rise to the level of jeopardizing the company's viability? Because when the company filed for rule for Chapter 11, there was nothing in there about silica claims that was asbestos-less. Your Honor, this was an asbestos bankruptcy. This was filed when other asbestos defendants could not handle asbestos claims. During the course of the bankruptcy and in preparing a plan of reorganization, this flood of silica cases hit other refractory companies and other companies. In the narco side of this bankruptcy, we were able to do a contract in which Honeywell would handle all of the silica cases except we would pay 40% of our free cash flow or $3 million as the first money in defending the silica claims against narco. We could not reach any type of similar arrangement for AP Green, and therefore, we had to plan the way Harbison, our sister company, had to plan in its bankruptcy for silica claims. And so while they didn't hit our radar screen, when we filed the petition, it was an asbestos-related bankruptcy, it clearly was all over our radar screen by 2006 when we had to propose a plan. What is it that accounted for what you characterize as a flood of silica claims? It would go from 169 to 4,600. The surge, the sudden high amount of claims in a very short period of time? Your Honor, I'm not sure I know the answer to that. The diagnosis rates have remained standard, 3,600 to 7,200 a year. So while there were about 169 or 170 claims that mushroomed into 4,600 in a relatively short period of time. Your Honor, two answers to that. First, Harbison-Walker, which ends up with 18,000 claims, had 360 when we filed for Harbison-Walker. I appreciate that's more than 170, but not that much more, and they ended up with 18,000. Secondly, it's clear that when we looked at the Travelers Insurance Company files, they were the ones handling our silica cases. We had 169 and 500 silica claims against AP Green. It is true on the date we filed, we had 169, but historically it was clear from the Travelers files there were 400 to 500. Did anyone object at confirmation making the objection that with respect to silica there was collusion and or fraud? Yes, the insurers clearly said that these... But you're arguing that they don't have standing to do that, right? We are arguing that, but that was taken into account by the bankruptcy judge and the district court and by our expert. It all drives off of the Judge Jack decision. So if no one but the insurers made that argument and the insurers were found not to have standing to make that argument, isn't that sort of an elephant in the room? It's a little bit unclear to me, and I'm not a bankruptcy attorney, whether or not a court independently has some obligation to look at items in a confirmation plan. And so while you are correct, we believe that when it was looked at with all the facts in the case and all the testimony, in fact, there are legitimate silica claims. Well, Mr. Restivo, how would we know that if the only party questioning whether they're legitimate or not is told you don't have standing to even speak on the matter? I mean, isn't that the point made in the Congolium case, that if the only parties that have an interest in raising something are kept out, that's a bad thing, and they ought to have standing to raise the problem? Your Honor, you're correct that if there's no standing, they can't raise it. But in the hearing by Judge Fitzgerald, that there was no standing. The insurers participated in the hearings with respect to the silica trust, and so when you look at the factual findings supported by the record, independent of standing, the factual findings are correct. So did the court thoroughly consider these allegations of fraud and collusion? Yes, Your Honor. Not only did the court do it, but our economic expert did it, the court, and defense attorneys like myself clearly was concerned about the Judge Jack decision. Clearly that decision shows what appears to be fraud in the system, and the bankruptcy judge made it clear she was not going to be a party to fraud on the system, and so that issue was vetted. But there were a number of claims that were asserted by individuals who had also asserted asbestosis claims, who are now asserting silicosis claims, and Judge Jack found that the likelihood of having both is akin to getting a hole in one. Now, what was the evidentiary basis for the bankruptcy court to say that you could have these asbestosis and silicosis claims by the same claimants? Your Honor, I think that the debtor conceded that the likelihood of having both is similar to getting a hole in one. The insurer's expert conceded, our expert also stated, that merely because people filed asbestos claims in the Manville bankruptcy didn't mean they had asbestosis. Whether or not they were paid, I don't think is part of the record, and Dr. Martin, their expert, testified, as she had to, that she didn't know whether a particular claimant had silicosis or had asbestosis or had both or had nothing. And so the mere fact that they filed asbestos claims in the Manville bankruptcy doesn't really tell you that if there was some mischief afoot, whether the mischief was in the Manville bankruptcy taking a silicosis claim and calling it asbestosis or vice versa. Wasn't it in that same context that the bankruptcy judge said that you can assert any claim or any defense that you have in the tort system, including fraud? As to the insurers, absolutely. I mean, if the possibility of having asbestosis and silicosis, on that basis, the insurers can have both? The plan is clear on that. Section 4.41 says, nothing in the JIT plan or any of its documents precludes any entity from asserting in any proceeding any and all claims, defenses, rights, or causes of action held by an insurer with the exception of the anti-assignment clause. Doesn't the validity of the claims at the outset affect the Section 105A analysis, the mischief was created somewhere, whether it's in the asbestos or the silica claims, shouldn't that be investigated before deciding you need a channeling injunction for the silicosis claim? It doesn't matter whether the plan should be confirmed at all. I think not, Your Honor. It certainly has not been the practice in the asbestos case. In the 105 Dow Corning case, I believe there is still a medical dispute whether or not breast implants medically lead to any disease process. Obviously, with hundreds of thousands of breast implant claims, the debtor, first the company then it became a debtor, had to deal with them, had to do something with them. It may be true that when investigated, which in the tort system would be discovery and trial and cross-examination, ultimately Dow Corning might have won each and every one of those hundreds of thousands of breast implant claims. But merely taking on the effort, and our testimony is in the record, that AP Green cannot fund a defense effort similar to the one it funded for asbestos before bankruptcy. It simply does not have the free cash flow to hire attorneys and doctors. Are you skirting the issue of standing, because when asked about it, you say, well, the judge thought about that anyway, and our expert talked about it, but doesn't the party who is most at interest here, the insurers, have the right under these circumstances to go in and say, we've got some evidence, we've got some things we want to say to you that maybe you're not going to think of on your own as smart and able to judge as you are, and that our insurers may not want or be inclined to bring up to you, hear us. Isn't that the message of Congolium? I think not, Your Honor, that if the insurer has that right, sometimes it's characterized as a duty to cooperate, sometimes it's characterized as providing information, and they can prove to a coverage court that that duty was not discharged by the policyholder, then they don't have to pay a claim whether or not the claim is valid. Well, that gets the cart before the horse. Judge Van Askew has asked you, don't you have to have, don't you have to dispel the allegations of fraud and the inference that might be drawn from going from 169 to close to 5,000 claims like that before you can make a credible claim that there's a necessity for channeling injunction? Again, I think the answer to that is no, and it's not done, but in this case, the protection against fraud instituted by the parties and by the bankruptcy judge was that the votes and the claim information on silica, the exposure information and the medical claim of the disease all were filed under penalty of perjury by the 4,600 claimants. When you answer the question, you're saying 105 doesn't apply, the court doesn't have to worry about whether or not this is necessary because the allegations were pursuant to a claim of perjury. I'm not sure that meets the 105 question. No. No. I am saying it is necessary because you have 4,600 present claims attested to under pain of perjury. But go back to hole in one. That hole in one likelihood analogy was true as to every single claimant. It boggles my little mathematically disabled mind what the odds would be as to that many people having both silicosis and asbestosis. If only one, the likelihood of that is akin to hole in one, and then you find out, well, we got 3,000 hole in ones going on in here. The roughly 50% of such claimants, I think they're the same ones that were diagnosed by the Judge Jack Doctors, was taken into effect in the estimates, that's the low end of the low to high end, and the insurers put on all their evidence about fraud at the hearings, and the judge clearly was familiar with Judge Jack's decision, and the bankruptcy judge made findings of fact that the estimate, when it took into account the cases you're talking about, Judge McKay, and took into account the Judge Jack Doctors, and came up with a low end figure, that was a reasonable estimate. What the insurers tried to do is take out a number of cases, a couple thousand, diagnosed by two doctors, Gaziano, I can't remember the other name, who were not Judge Jack Doctors, and indeed the one they tried to take out was used by Judge Jack as an example of what a examining physician should do in diagnosing a silica case. Mr. Stewart, let's finish your sentence, your light is on, and I didn't allow Mr. Groblat any leeway, so let me hear from your colleague, thanks. Your honors, may it please the court, my name is Peter Lockwood, and I represent the Apolli Asbestos Accreditors Committee. Your voice is a lot softer than Mr. Estivo's, maybe you could either pull the microphone closer or speak a little closer. Is this better, your honor? Sorry. Given the shortness of time here, I'm not going to, it's clear that the court has read the papers, I would just like to start out briefly by responding, making a point about a colloquy between the court and Mr. Groblat. One of the court asked Mr. Groblat how the insurance was going to be available if the insurer's rights to consent to assignment to third parties were enforceable against a successor trust such as the Liquidator Trust, and you got an answer which really didn't answer that, because it started, Mr. Groblat started talking about they have noticed defenses that they could assert against the debtor. The problem in this case is that the plan provides for the creation of a trust, like a Liquidator Trust is common in bankruptcies, to resolve over many, many years, not all at once in front of the bankruptcy court through individual allowance procedures, a lot of The trust has to have funding in order to pay the liabilities. If this assignment was made in the plan, but as Mr. Groblat argues, was subject to being overturned in a coverage litigation, effectively you have a potential for a post-consummation determination that the plan is unfeasible, because the trust that you've created in the plan and the means of implementing it, which is transferring the insured liabilities and having the insurance follow those liabilities, would be completely defeated if the insurance remained back at the debtor, because at that point you'd have a catch-22 situation. The trust would have the liabilities, but no insurance. The debtor would have the insurance, but no liabilities. And at no point in the briefing of these papers have the insurers ever said that they would not argue that if the insurance was left behind with the debtor, that they could not, under the neutrality provision, argue that there was no insurance available. What you're arguing is that the insurers have a dog in the fight. I'm not addressing the standing issue, Your Honor. I'm addressing the merits of their argument. They clearly have an objection to the assignment of their policies to the trust. They characterize it as a consent clause that allows them to refuse to transfer to third parties. And in their brief, they use the example of some mom-and-pop business selling their insurance coverage to General Motors. With all due respect to Mr. Goldblatt, this is not that hypothetical or anything remotely like it. This trust is the recipient of claims against the debtor's estate. Under 541C of the Bankruptcy Code, the estate that was created in this case, notwithstanding any restrictions on transfer, included both the claims against the estate and the insurance of the estate. And as I said before, it boggles the mind to have a situation in which you start out pre-petition with insurance and liabilities that are together. And if the insurer, if the insured needs to have a trust to resolve claims over time, so that it can consummate the plan and get out of bankruptcy and not spend 30 years litigating tort claims in allowance procedures, effectively, if you can't have the insurance follow those liabilities into that trust, you're saying that you can't have the trust in the first place. And Mr. Goldblatt, in his papers and his argument, has conceded that once the trust is set up, the silica trust distribution procedures basically say that if you find a doctor to say that the person has silicosis, that that is, quote, presumptively reliable under Article 5.7A2. And so, in effect, the insurers are coming in after a finding has been made or a plan or the procedures say that it's presumptively reliable, and it's not a level playing field, is it? Your Honor, every asbestos trust in this country has refused, under an identical provision in the asbestos trust and TDP provisions, to accept diagnoses from the Judge Jack Doctors. It may well be that there's a, quote, presumption, close quote, but a presumption is rebuttable. And the Manville Trust was the first one rejected it, and every other asbestos trust since then has rejected those. So, there's no reason to believe that the silica trust is going to behave any differently given the trustee's fiduciary obligations. Mr. Lockwood, the question is, did the standards and the rights of the insurers change under this plan? And as Judge Ambrose pointed out, there's a presumption that the insurers face when things are channeled through the silica trust that they would not have faced in the tort system, right? Your Honor, that ignores, no, that ignores the insurance neutrality provision. The insurance neutrality provision says nothing in the plan, and the plan includes the TDPs in the trust agreement shall affect their defenses. Okay. So, you've got a part of your plan that says we're insurance neutral. And then you've got another part of your plan that says these things are presumptively reliable. I don't think it answers the question about a change in their posture to say, well, we said it was neutral someplace else. How do you get neutral out of presumptively reliable? Judge Jordan, the TDP provisions for silica claims are for silica claims resolved by the trust. Whether or not the insurers then have to reimburse the trust for those claims is a wholly different issue that will be resolved in coverage litigation. Mr. Goldblatt and the other insurers objecting here, the appellees, have made it perfectly clear that they do not intend to give a dime to the silica trust for any claims resolved under this so-called presumption that you're referring to unless and until some coverage judge tells them that they have to. The limited exception that's been carved out here for the anti-assignment provision has to do with trying to make sure that people who vote for this plan at least have the minimal assurance that they will not be faced with a catch-22 after consummation in which it is determined in state court litigation to have been invalid, at which point you have nothing in the trust to pay claims. How do you answer the question Mr. Goldblatt has raised about this being, if we interpret 1123A that way, that's so sweeping that it would make much of the rest of the bankruptcy code really irrelevant because it has careful balances going on that it would override important state interests and that's why you've got 17 or 18 attorneys general in here. What's the response to that? There are multiple responses, unfortunately, to that question. The first one is that what we are trying to focus on is the term means for implementing the plan. Most of what Mr. Goldblatt has talked about is putting provisions in the plan themselves that are not a means for implementation, but simply we're going to transfer our assets to a nuclear power plant to Russia or something like that. That's hardly a means for implementing a plan. More broadly, there are several sections of the plan of 1123A which are clearly preemptive. For example, in G, it provides you can have satisfaction or modification of a lien. Well, that modification right is preemptive over state law contracts that would say you can't modify a lien. Doesn't that make his point though? I mean, if there are specific examples in the code of preemption, why would we read 1123A as a broad all-encompassing? Because that subsection I just mentioned is a subclause of 1123A-5. It is the only source in the bankruptcy code that expressly allows you to modify a lien, to cancel or modify an indenture, which is subclause F, to cure or waive a default. If your contract said that you could, a breach of the contract was non-curable, that you could extend a maturity date or a change in interest rate. Mr. Lockwood, how do you harmonize though the broad preemption in 1123 with the more narrow preemption in 1142 dealing with non-bankruptcy laws concerning financial condition? I harmonize that, Your Honor, by saying that if you look at 1142, it talks about implementing a plan and implementing orders of the court. And there are many things that one does upon consummation of a plan that are not spelled out in the plan. I mean, you have to, you have among others, you have an effective date, you have a closing, people come in and execute documents. What that, what that provision deals with primarily are acts and conduct other than implementation of specific plan provisions that specifically say what you have to do in order to implement the plan. This is, allows you to do a whole variety of other things of implementing that aren't spelled out in the plan. And moreover, to read, as PG&E did, the laws relating to financial condition, clause of 1142 and to 1123A, is to violate numerous Supreme Court cases that say essentially that you can't take language from one statutory provision and insert it in another statutory provision which lacks it. Ron Payer, for example, Hartford Underwriters, are two Supreme Court cases. Lamey in the Supreme Court is another one. Is the limiting principle that you would have us adopt the means to implement a plan language that you've quoted to us that is your, is your bottom line answer to Mr. Goldberg? No, Your Honor. The other, the other provisions have to do with 1129A3 of the code and also the, what I'd call the sort of common law, if you will, exception for public health and safety that's expressed in the Mid-Atlantic case. 1129A3 says a plan has to be proposed in good face. I suggest with all due respect to Mr. Goldblatt that a plan that, you know, purported on its face to, to provide for the sale of illegal guns to parties unauthorized to hold those, to purchase those guns would be a plan provision that would violate the good faith provision because it would be patently illegal. And it's not a means for implementing the plan because you could sell the guns to somebody that was entitled to use them. And here there's no alternative mechanism for getting the insurance to follow the insured claims. And that, that's the basis for saying it is legal because it's necessary in order to fund the plan. It's necessary under the bankruptcy law and the override here is trivial. Mr. Goldblatt keeps talking about the bargain for right to consent to assign to the third parties. Those very same parties that have that, the policies that have that language in them have are called insolvency clauses, which say nothing, you cannot take advantage of the insolvency or bankruptcy of the insured to avoid your obligations. Similarly, Section 524E of the Bankruptcy Code says the discharge of the debtor doesn't discharge any other party liable, such as an insurer for the debt. And what, what Mr. Goldblatt's clients are attempting to do is to take this boilerplate provision aimed at sales of the coverage to third parties and convert it into a mechanism that would effectively eliminate the ability to use liquidating trust types of the sort used in asbestos cases, in Dow Conch Shield, in Dow Corning, and now in this case for silica claims and make them simply unworkable. Can I ask you to go, just interpret something for me with regard to the silica trust procedures or distribution procedures? I had quoted to you earlier 5.7A2, which said that if you get a doctor to certify that, to opine that you have silicosis, that that's presumptively reliable. And then the next sentence after that, it says, in addition, claimants who otherwise meet the requirements of the distribution procedures, that is, get a doctor to come in and say that they have silicosis, for payment of the claim, shall be paid without regard to the results of any litigation at any time between the claimant and any other defendant in the tort system. It seems, looking at that, is that if you lost elsewhere in the tort system against another defendant, and maybe even, for example, in the Texas litigation where the judge thought that there might be fraud or collusion, that doesn't stop you from coming in here. Two points, Your Honor. First, generally speaking, jury verdicts are general verdicts, and you don't know why somebody lost. So, you could lose a case against another silica manufacturer on the ground that you didn't prove exposure to that manufacturer's product. That would be irrelevant to whether or not you had exposure to a product manufactured by A.P. Green. And that was one of the reasons for the provision in there, is to just make sure that the mere fact that you lost under a general verdict, which didn't tell you why you lost, could somehow or another be raised to stop you. It's not limited. They've still got to prove exposure. It's not limited to general verdicts. What he just read was not limited to general verdicts. That might be the reason, but if you have a situation where you have jury interrogatories, that provision would still apply. That's true. And the second part of my answer is that in that limited category of cases where you might arguably say there was some sort of, well, let me back up. Normally, you can't use non-mutual collateral estoppel defensively. You can only use it offensively. And the effect of the rule that you posit, Judge McKee, is that the trust would, in effect, be using defensively against the claimant the fact that the claimant had lost against somebody else. And normally, you wouldn't be permitted to do that. But more importantly, from the perspective of this case, the insurers have the right to say, we're not going to pay that claim. The trust can pay it out of its assets if it wants to, but it's not paying it out of our pocket, because if we have the right to assert a collateral estoppel or a race judicata or what have you defense based on a loss in the tort system by that claimant against some other defendant, they have the right to assert that. Mr. Lockhart, your light is on. We'll let you go over, because you're answering a question. But thank you very much. Maybe you could start your rebuttal time by responding to what at least struck my little feeble mind as being a good argument, that if you prevail, it has the practical consequence of separating the liabilities from the coverage, and you create a system which basically allows for post-confirmation attacking the plan. Sure. Let me explain, if I may. First of all, this case is an express preemption challenge. The argument with respect to the consent to assignment provisions that is expressly preempted by Section 1123A5. They haven't made an implied preemption argument. And I think this point gets to whether there's an implied preemption. But let me address it nevertheless. The argument completely misapprehends the way the consent to assignment defense works under state law. Under state law, whether that defense will be respected or not typically requires an insurer to show that something that happened in the assignment has changed the risk or left the insurer worse off. To the extent that the risk is the same, this is a state law question. It's highly fact specific, and so it can't be answered with clarity. But as a general proposition, there isn't a windfall here. All the insurers are asking for is if they have a case to be made that under state law, this defense would be respected because something that has happened in the assignment has left them worse off. There is no principle of bankruptcy law that should interfere with our ability to make that right, make that argument. That doesn't seem to me to be answering the question, though, Mr. Goldblatt. The point that was made by Mr. Lockwood is if your defense on the anti-assignment clause is preserved and not dealt with up front, then you have the untenable position of the court approving a plan which becomes a nullity after the fact. And that that's just something that that can't be logically. Yeah. And respond to that. And on facts, it's not true. In this case, the trust is being funded by thirty five and a half million dollars of insurance. And that is money. And the clarity will be claims. And the claims may be more than thirty and five and a half million dollars in which they don't get played in full. Or it may be there may be other assets, depending on what happens with respect to interest. But there isn't a feasibility issue. Whether they recover money from other non-settled coverage affects the payment percentage. But there is no question that this plan is feasible. There's more than enough money for the plan to work. So your your argument is that might happen in some other situation, but not in ours because we're excess carriers. So don't worry about not on the facts of this case as it comes to this court that you can imagine a case in which you need to engage some feasibility analysis. Don't we have to imagine those cases by what we'd say in this case? Sure. But that's that's in this regard. The anti-assignment defense is no different from any other coverage defense. You can imagine a case in which you have to in order to decide whether the whole second Mr. Lockwood just outlined a way in which it's different. Your other defenses, if you bring them up after the fact, according to him, they don't destroy the workability of the plan by his assertion. If you if we took the position you're taking as a matter of law, we would be saying anti-assignment defenses in all cases have to be preserved. And therefore, you'd set up a circumstance where the trust would have the liability, but not the insurance. And the debtor would have the insurance, but not the liability as he could have. So what's the what's the answer? The answer is other than it's not our case. No, that it misapprehends the nature of the defense state. The consent to assignment defense is not a gotcha where you can come in and say, aha, there's no coverage at all. It typically requires the insurer to demonstrate that there's something in the nature of the assignment that left them worse off. Didn't the bankruptcy court make a finding in this case, at least applying state Pennsylvania law, that the anti-assignment clause was not enforceable, that the risk had not changed? The court did talk about Pennsylvania law. There's no basis to say Pennsylvania law applies to these policies. And the parties had agreed below that the question was resolved on an issue of federal law. If I can return to an issue that Judge Jordan was addressing in response to part of what Mr. Lockwood said in response to your Honor's question, he raised the provision, section 1123A5G, about modification of liens. That provision, it amply demonstrates why his reading of 1123A has to be wrong. In the Philadelphia newspapers case recently in this court, there was disagreement about the right to credit bid, but everyone agreed that the secured creditor was entitled to the indubitable equivalent of the value of the claim. If 1123AG means what Mr. Lockwood says, which the plan can just provide for the modification of the lien, then the dispute there was of no moment. And it turns the express provisions of section 1129 that deal with the treatment of a secured creditor's claim into nonsense. And the discussion that this court spent some time on about making sense of indubitable equivalent would all be beside the point because 1123A5G says it can just be modified under a plan. Turning the bankruptcy code on its head that way cannot be what Congress intended. It can't be the reading of 1123A that it's appropriate to do. Could we switch, uh, do we have time? We don't now. Right. Uh, we, we, we talked a little bit about your allegations of collusion and fraud. At a minimum, should we be sending this back for, for some more, for another look-see by the bankruptcy court? At a minimum. Look at that, to look at those allegations. At a minimum, the answer to that is yes. We think that the debtor had the burden of proof of demonstrating that they needed an injunction in order to reorganize. We think that upon this having been tried twice before the bankruptcy court, the debtor didn't meet its burden under the applicable standard that to conclude otherwise, the court applied the wrong standard and it should be reversed. But if there were any question about that with regard to the, the sufficiency of the evidentiary record, then in that case, surely a remand would be, uh, preferable to an affirmance. Okay. That's very good. But thank you. Thank you very much. Very, uh, interesting. This is very well argued on both sides. And we thank everyone for your, for your input on the case. We'll take it on the advisory.